UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE UNITED STATES OF AMERICA<br><br>    Plaintiff,<br><br> v.<br><br>MARMON HOLDINGS, INC. and MARMON WIRE & CABLE, INC.,<br><br>    Defendants. | Case No. 2:10-CV-00526-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Pending before the Court is Defendants' Motion to Dismiss the Amended Complaint (Dkt. 10). The motion is pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). Having fully reviewed the parties' written briefing, the Court finds that the motion is suitable for disposition without oral argument. For the reasons explained below, the Court will deny the motion.

## BACKGROUND

This case concerns Defendants' liability under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") for mining related pollution within the Bunker Hill Mining and Metallurgical Complex Superfund Site ("Bunker Hill

Superfund Site") in northern Idaho.  The following facts are taken from the Government's Amended Complaint, which the Court will accept as true for the purposes of this motion.

In 1927, Golconda Lead Mines, Inc. founded the Golconda Mine and Mill near Lake Coeur d'Alene.  The operation of the mine resulted in the release of hazardous substances into the Coeur d'Alene Basin watershed.  Through a series of mergers and name changes, Golconda Lead Mines, Inc. became Group R. Co., Inc. ("Group R").  In 1985, Defendant Marmon Wire & Cable, Inc. ("Marmon Wire") became the sole shareholder of Group R.  (Am. Compl. ¶ 24, Dkt. 2.)  Subsequently, between 1986 and 1988 Group R transferred its assets to Marmon Wire, leaving Group R insolvent.  (*Id.* ¶ 25.)  Marmon Wire then transferred the stock of Group R to its parent corporation, Defendant Marmon Holdings, Inc. ("Marmon Holdings"), in 1991.  (*Id.* ¶ 9.)  Group R, a Delaware corporation, filed a certificate of dissolution with that state in 2003.  (*Id.* ¶ 31.)  Marmon Holdings, as the sole shareholder, signed a Plan of Liquidation with Group R.  The Plan of Liquidation included a "Plan of Distribution to Creditors."  (Mot. to Dismiss, Ex. A, Dkt 10-3 at 5.)

Meanwhile, in 1983 the Environmental Protection Agency ("EPA") designated the Bunker Hill Superfund Site on its CERCLA National Priorities List and noticed the listing in the Federal Register.  (Am. Compl. ¶ 23.)  The EPA divided the Site into three operable units.  (*Id.* ¶ 22.)  The EPA issued a Record of Decision for Operable Unit 1 in 1991 and Operable Unit 2 in 1992.  (*Id.*)  EPA issued an interim Record of Decision for Operable Unit 3 in 2002.  (*Id.* ¶ 30.)  Unit 3 includes the former Golconda Mine and Mill

MEMORANDUM DECISION AND ORDER - 2

operation.  (*Id.* ¶ 35-36.)

The United States now brings suit against Marmon Holdings, seeking recovery of costs incurred in the clean-up of Unit 3 under 42 U.S.C. § 9607(a).  It also seeks to void the asset transfers made from Group R to Marmon Wire, alleging those transfers were fraudulent under 28 U.S.C. § 3304(b)(1)(A).  Defendants move to dismiss the complaint.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation omitted).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.*  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557.

In a more recent case, the Supreme Court identified two "working principles" that underlie *Twombly*. *See Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009). First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Id.* "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1950. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Providing too much in the complaint may also be fatal to a plaintiff. Dismissal may be appropriate when the plaintiff has included sufficient allegations disclosing some absolute defense or bar to recovery. *See Weisbuch v. County of L.A.*, 119 F.3d 778, 783, n.1 (9th Cir. 1997) (stating that "[i]f the pleadings establish facts compelling a decision one way, that is as good as if depositions and other . . . evidence on summary judgment establishes the identical facts").

A motion to dismiss should not be granted "unless it appears beyond doubt that Plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Clegg v. Cult Awareness Network*, 18 F. 3d 752, 754 (9th Cir. 1994). All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the non-moving party. *See Buckey v. County of Los Angeles*, 968 F.2d 791, 794 (9th

MEMORANDUM DECISION AND ORDER - 4

Cir. 1992). The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). While amendments are liberally permitted under Rule 15(a), the district court may deny leave to amend when there has been an undue delay in bringing the motion, and the opposing party would be unfairly prejudiced by the amendments. *See United States v. Pend Oreille Public Utility Dist. No. 1*, 28 F.3d 1544, 1552-53 (9th Cir. 1994).

Generally, the Court may not consider any material beyond the pleadings in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994). If materials outside the pleadings are considered, the motion is converted to a motion for summary judgment governed by Fed. R. Civ. P. 56. *See Jacobsen v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir. 1995).

But as *Branch* makes clear, there are times when documents other than the pleadings can be considered without converting a motion to dismiss into a motion for summary judgment. "[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Branch*, 14 F.3d at 453.

## ANALYSIS

### A.  First Claim for Relief

Under the Government's first claim for relief, it alleges that Marmon Holdings is an "owner" and "operator" of Golconda Lead Mines, Inc. for CERCLA liability purposes, because it is the "successor-in-interest" to Group R.  (Am. Compl. ¶ 43.)  The Government contends that the language of Group R's Plan of Liquidation is sufficient to render Marmon Holdings liable under CERCLA.

As a preliminary matter, Defendants correctly note that the Ninth Circuit has not resolved whether state law or federal common law governs successor liability under CERCLA.  *See Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.,* 159 F.3d 358, 364 (9th Cir. 1998).  As in *Atchison*, this Court need not decide whether federal or state law controls, because the Amended Complaint alleges that Marmon Holdings expressly assumed liability through the Plan of Liquidation.  Express assumption of liability is a standard basis for successor liability recognized both in federal common law and in Delaware law.  *See id.* at 361 (holding under federal common law, successor liability is created when "[t]he purchasing corporation expressly or impliedly agrees to assume the liability."); *Great American Ins. Co. of New York v. TA Operating Corp.*, No. 06 Civ. 13230, 2008 WL 1848946, at *3 (S.D.N.Y. April 24, 2008) (recognizing that under Delaware law liability attaches when "the successor expressly or impliedly assumed such liability.").

The disagreement between the parties turns on interpretation of the 2003 Plan of Liquidation ("Plan") signed by Group R and Marmon Holdings.  The Plan includes a section titled "Plan of Distribution to Creditors," which restates in entirety the language of section 281(b) of Delaware's General Corporation Law.  (Mot. to Dismiss, Ex. A, Dkt 10-3 at 5.)  This statutory language is followed by one sentence of unique language, which provides that claims against Group R "may be made by obtaining an undertaking from [Marmon Holdings] to return such part, or all, of any distribution(s) . . . as is necessary in order to pay or provide compensation for such claims and obligations."  (Am. Compl. ¶ 7.)  The Government contends that this amounts to a direct assumption of liability by Marmon Holdings.  Defendants counter that this language, particularly when read in the context of state law requirements concerning shareholder liability, only commits Marmon Holdings to return disbursements in the event of a judgment against Group R itself.  (Defs. Brief in Supp. of Mot. to Dismiss, Dkt. 10-1 at 11.)

Because the Plan was drafted by the parties under Delaware law, the Court applies principles of contract interpretation from that state. "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1222 (Del. 1997).  A contract is ambiguous if it is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Phillips Home Builders, Inc. v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del. 1997) (quotations omitted).  When there is ambiguity, the reviewing court may consider extrinsic evidence of the parties' intent. *Eagle Indus., Inc.*,

MEMORANDUM DECISION AND ORDER - 7

702 A.2d at 1232.[1]

Whether the language of a contract is ambiguous is a question of law.  *In re U.S. Financial Securities Litigation*, 729 F.2d 628, 632 (9th Cir. 1984).  The parties' intent, determined through extrinsic evidence, is a question of fact.  *Id.*

Applying these principles, the Court looks first to the plain language of the Plan.  The Court finds that there is ambiguity as to whether its language exposes Marmon Holdings to direct liability.  The Plan commits Group R to "make such provision as will reasonably be likely to be sufficient" to compensate claims likely to "arise or to become known to the Company within 10 years after the date of dissolution."  (Mot. to Dismiss, Ex. A, Dkt. 10-3 at 5.)  The Plan then states that "[p]rovision for such claims and obligations may be made by obtaining an undertaking from the sole stockholder" to return distributions received during dissolution."  (*Id.*)  This language might mean that Marmon Holdings is only obligated to return distributions in the event of a judgment against Group R.  But it might also be read to mean Marmon Holdings "undertaking" commits it to direct liability for claims against Group R once that corporate entity ceased to exist.  The Plan is silent as to whether Marmon Holding's duty to provide compensation encompasses the duty to defend against such claims.  Because the language of the Plan is

---

[1] These principles of contract interpretation are the same as those that would be applied under federal law.  *See Pierce Cnty. Hotel Emp. & Restaurant Emp. Health Trust v. Elks Lodge*, 827 F.2d 1324, 1327 (9th Cir. 1987) ("Extrinsic evidence is inadmissible to contradict a clear contract term, but if a term is ambiguous, its interpretation depends on the parties' intent at the time of the contract's execution, in light of earlier negotiations, later conduct, related agreements, and industrywide custom[.]") (internal citations omitted).

susceptible to multiple reasonable interpretations, the Court finds that a resort to extrinsic evidence is necessary.[2]

As Defendants emphasize, Delaware law is relevant extrinsic evidence of the parties' intent, given that the Plan incorporates § 281(b) of Delaware's General Corporation Law nearly verbatim. *See* Del. Code Ann. tit. 8, § 281(b). Unfortunately, Delaware law does not deal squarely with the issue before the Court. Section 281(b) operates against the backdrop of § 278, which provides that a dissolved corporation continues to exist as a legal entity for three years after its dissolution, solely "for the purpose of prosecuting and defending suits." § 278. Sections 280 and 281(b) offer two alternative avenues through which a dissolved corporation may provide for potential claims by creditors during this winding down period. The purpose of these statutes is to "balance the competing public policy interests of ensuring that claimants against the corporation had a time period in which to assert claims against the dissolved corporation and ensuring that directors, officers, and stockholders of a dissolved corporation could have repose from claims regarding the dissolved corporation." *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 789 (Del. Ch. 2007).

---

[2] It is clear from the language of the Plan that if Marmon Holdings is directly liable, its liability is limited to the extent of distributions made to it during Group R's dissolution. Defendants assert that this limited liability "is a far cry from direct CERCLA liability." (Defs. Brief in Supp. of Mot. to Dismiss at 10.) But there is no reason that the contractual assumption of liability cannot be limited in scope by the parties. *See, e.g., Inamed Corp. v. Medmarc Cas. Ins. Co.*, 258 F. Supp. 2d 1117, 1124-25 (C.D. Cal. 2002) (examining terms of merger agreement to determine extent of successor liability).

MEMORANDUM DECISION AND ORDER - 9

The Government's interpretation in this particular case is plausible because there is an apparent gap in this statutory scheme. Section 278 extends the life of a dissolved corporation for three years, while § 281(b) requires that the corporation make provision for claims that could arise against the dissolving corporation within ten years. When a corporation does not comply with § 281(b) by making provision "reasonably likely to be sufficient," and a claim arises within the seven year window after the corporation has ceased to exist, it is not clear who, if anyone, remains liable.

Delaware courts have yet to address this statutory gap. Defendants appear to be correct that there is not any Delaware case law that interprets § 281(b) as imposing successor liability in this or any other circumstance. However, the Court is also unable to find any precedent that squarely refutes the Government's interpretation. The Delaware courts have not resolved the dissonance between the three year wind up period in § 278, and the ten year window in which the dissolved corporation must make provision for claims under § 281(b), and it is not proper for this Court to do so at this time.[3]

---

[3] There are a number of reasonable ways in which the Delaware Supreme Court could respond to this statutory gap, making it particularly inappropriate for this Court to attempt an authoritative interpretation. First, section 278 states that corporations shall be continued for three years "or for such longer period as the Court of Chancery shall in its discretion direct." The court could determine that this is the remedy available to a party with a late arising claim. Second, § 282(b) protects the stockholders of a dissolved corporation that winds down pursuant to § 280 from liability for any suit brought after the three year period. Since this statute does not specify that stockholders of corporations winding down pursuant to § 281(b) are similarly protected, those stockholders might be directly liable under the principle of statutory construction that "what is not included is excluded." Third, the courts could adopt the position, advanced by Defendants, that the unambiguous three year wind up period created in § 278 is not expressly modified by the language in § 282(b), and therefore a late claimant simply has no remedy.

The Court holds that the language of the Plan is ambiguous, and finds that the extrinsic evidence of its meaning presented by the parties is insufficient for it to rule that the Government has failed to present a plausible claim for relief.  Further evidence of the parties' intent is necessary to determine if Marmon Holdings assumed direct liability for claims against Group R.  Therefore, the Government's first cause of action survives the motion to dismiss.

### B.  Second Cause of Action

Under the Government's second cause of action, it seeks avoidance of the transfer of assets from Group R to Marmon Wire that allegedly occurred between 1986 and 1988. (Am. Compl. ¶ 25.)  It alleges that the transfers were made with "actual intent to hinder, delay or defraud" the United States as a creditor, in violation of the Federal Debt Collection Procedure Act ("FDCPA").  28 U.S.C. § 3304(b)(1)(A).

Defendants argue that this portion of the Amended Complaint is deficient in three respects:  First, it does not allege that Marmon Wire possessed the requisite state of mind. (Defs. Br. in Supp. of Mot. to Dismiss at 17.)  Second, Group R could not have possessed actual intent to defraud, because "Group R had no notice of any potential CERCLA claim by the EPA at the time of the dividend payments."  (*Id.*)  Finally, relief under the FDCPA is inappropriate because there has never been a judgment against Group R, so there is no "judgment on a debt" that the Government may seek to collect. (*Id.* at 14 (quoting § 3307(b)(1)).

Fraud claims must satisfy the heightened pleading requirements of Rule 9(b), which provides, in relevant part, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). The rule requires that the complaint allege "the who, what, when, where, and how" of the alleged fraudulent conduct, *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (internal quotations omitted), and "set forth an explanation as to why [a] statement or omission complained of was false and misleading," *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc); *see Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995). "The purpose of this rule is to ensure that defendants accused of the conduct specified have adequate notice of what they are alleged to have done, so that they may defend against the accusations." *Concha v. London*, 62 F.3d 1493, 1502 (9th Cir. 1995).

The Court holds that the Amended Complaint meets the heightened pleading requirement of Rule 9(b). The Amended Complaint alleges that Group R transferred assets transferred to Marmon Wire "to avoid payment of response costs to the United States under [CERCLA]." (Am. Compl. ¶ 46.) This is an adequate allegation of Group R's scienter under Rule 9(b). *See Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) (en banc) ("While the factual circumstances of the fraud itself must be alleged with particularity, the state of mind–or scienter–of the defendants may be alleged generally."). The Amended Complaint need not plead Marmon Wire's actual intent to defraud, because under the plain language of the statute, the scienter of the transferee is irrelevant in

MEMORANDUM DECISION AND ORDER - 12

establishing fraud.  *See United States v. Sherill*, 626 F. Supp. 2d 1267, 1275 (M.D. Ga. 2009) (holding that "intent of the transferee is irrelevant").  "[A] transfer made or obligation incurred by a debtor is fraudulent . . . if the debtor makes the transfer . . . with actual intent to hinder, delay, or defraud a creditor."  28 U.S.C. § 3304(b)(1).[4]  While there is little case law interpreting this provision of the FDCPA, courts have consistently held transferee intent irrelevant under the analogous provision of the Uniform Fraudulent Transfer Act.  *See Sherill*, 626 F. Supp. 2d at 1275 (collecting cases).

The Amended Complaint also alleges, based upon information and belief, that Group R transferred nearly all of its assets to Marmon between 1986 and 1988.  (Am. Compl. ¶ 25.)  The Government grounds its allegation of actual intent to defraud with the fact that in 1983 the EPA listed the Bunker Hill Superfund Site on its CERCLA National Priorities List ("NPL") and provided public notice through the Federal Register.  (*Id.* ¶ 23.)  Defendants counter that the NPL listing could not have provided actual notice to Group R, because it did not identify the Bunker Hill Superfund Site boundaries, and the EPA later delineated the site so that it did not include the Golconda Mine and Mill. (Defs. Reply Brief in Further Support of Mot. to Dismiss, Dkt. 14 at 10.)  This factual disagreement about the adequacy of notice is not grounds for dismissal at this stage. Assuming that the  factual allegations of the Amended Complaint are true, *Twombly*, 550 U.S. at 555, the Government has adequately pled that Group R transferred assets to

---

[4] It is not before the Court whether the defenses the FDCPA establishes for transferees are applicable here.  *See* § 3307.

**MEMORANDUM DECISION AND ORDER - 13**

Marmon Wire with knowledge of its liability under CERCLA.

Defendants also take issue with the remedy sought by the Government under the FDCPA.  Defendants argue that 28 U.S.C. § 3306(b)(1)(A) allows the Government to seek avoidance of the transfer of assets only after it has obtained a judgment against the now dissolved Group R.  However, the Amended Complaint does seek a judgment against Group R, through Marmon Holdings as its successor-in-interest.  As the Government concedes, its second cause of action is contingent upon the successor-in-interest argument made in its first cause of action.  But because a factual basis for successor liability is adequately pled there, the second cause of action also survives the Motion to Dismiss.

## ORDER

**IT IS ORDERED**   Defendants' Motion to Dismiss the Amended Complaint (Dkt. 10) is **DENIED**.

DATED: **September 19, 2011**

Honorable Edward J. Lodge
U. S. District Judge