UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

THE UNITED STATES OF AMERICA

Plaintiff,

v.

MARMON HOLDINGS, INC. and
MARMON WIRE & CABLE, INC.,

Defendants.

Case No. 2:10-CV-00526-EJL

**MEMORANDUM DECISION AND
ORDER**

**INTRODUCTION**

Pending before the Court are cross motions for summary judgment (Dkt. 38, 39 and 42).Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record.  Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.    For the reasons explained below, the Court will deny the motions for summary judgment and the matter will proceed to a bench trial.

## BACKGROUND

This case concerns Defendants' liability under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") for mining related pollution within the Bunker Hill Mining and Metallurgical Complex Superfund Site ("Bunker Hill Superfund Site") in northern Idaho.

In 1927, Golconda Lead Mines, Inc. founded the Golconda Mine and Mill near Lake Coeur d'Alene. The Government maintains that the operation of the mine resulted in the release of hazardous substances into the Coeur d'Alene Basin watershed. This Court is very familiar with the Superfund designation and mining history of the Coeur d'Alene Basin based numerous actions filed in Federal Court including the CERCLA action in *United States v. Asarco*, et al, Civ. Case 96-122-N-EJL. In this case, the first legal hurdle the Government must establish is that the Defendants are liable parties under CERCLA.

It appears undisputed that through a series of mergers and name changes, the Government argues Golconda Lead Mines, Inc. became RegO Group, Inc. ("RegO") which in 1992 changed its name to Group R. Co., Inc. ("Group R"). Defendants do not argue the existence of RegO and Group R, but argue that there were other corporate transfers of Golconda mining assets that did not involve the Defendants.

The Court finds the following corporate history relevant to the motions for summary judgment:

1.  Golconda Lead Mines, Inc. ("Golconda") was incorporated in Idaho in 1927 and operated the Golconda Mine and Mill (the "Golconda Site") until the 1950s.  The Golconda Site is located east of Wallace, Idaho.  Mining operations at the Golconda site ceased in the 1950s.  Golconda continued in business and acquired investments in other mining companies.

2.  In 1970, Golconda incorporated a subsidiary in Idaho called Golconda Mining Corporation ("GMC").  GMC succeeding to Golconda's mining assets including the Golconda Site.

3.  Also in 1970, the parent corporation Golconda merged with Astro Controls, Inc. with "Golconda Corporation" being the surviving entity.  As a result of the merger, Golconda Corporation acquired several manufacturing companies having no connection to mining activities.

4.  In 1976, Harry Magnuson, who was a director, shareholder and officer of Golconda Corporation, purchased the assets of the subsidiary GMC including GMC securities, the mill and associated real estate more particularly described in Exhibit A of the corporate minutes for $175,000.  Rodburg Decl. Ex. J, Dkt. 38- 5.  Defendants maintain that this purchase included all of the Golconda Site and that since 1976, Golconda Corporation had no ownership or control over the Golconda Site or any of its mining activities in the Coeur d'Alene Basin.  While the Government does not dispute that GMC purchased certain mining assets, the Government maintains that Group R was a successor in interest to the Golconda Corporation which was also an

owner or operator of the Golconda Site and therefore Group R is also liable under CERCLA.

5.  In January 2012, the Court approved a Consent Decree between GMC and the United States settling GMC's CERCLA liability.  *See United States e al. v. Alice Consolidated Mines, Inc., et al.*, Civil Case No. 11-446-C-EJL, Dkt. 6.  In that Consent Decree on page 3, the United States agreed:

> Golconda Mining Corporation, incorporated in Idaho in 1970, owned or operated and continues to own or operate mining or milling related properties within the Site, including the Golconda Mine and Mill site.

The Consent Decree was an "ability to pay" settlement with certain defendants and specifically stated the settlement was not equal to the response costs incurred or will be incurred.  Therefore, the Government maintains it should also be able to see response costs from other owners of Golconda prior to GMC.

6.  In 1977, Golconda Corporation, an Idaho corporation, merged into RegO Company, a Delaware corporation.

7. In 1978, RegO Company changed its name to The RegO Group, Inc. ("RegO"). Defendants maintain that RegO was the holding company for the manufacturing entities and subsidiaries acquired in the Astro Controls Inc. merger in 1970.

8. It appears RegO was a wholly owned subsidiary of Group R Co. Inc. ("Group R") (but the Court is unclear on when this ownership interest by Group R began or the exact date RegO changed its name to Group R).

**MEMORANDUM DECISION AND ORDER - 4**

9. It appears undisputed that in 1985, Defendant Marmon Wire & Cable, Inc. ("Marmon Wire") became the sole shareholder of Group R.[1]

9. Between 1986 and 1988, it is undisputed that RegO made dividend payments to Group R Co, Inc. and in turn Group R made dividend payments to Marmon Wire in the about of $42 million. The Government argues these dividend payments made Group R insolvent.

10.  Group R also made a dividend of its stock interest in Anderson Copper & Brass to Marmon Wire in 1987.

11.  It is undisputed that Marmon Wire is wholly owned by Defendant Marmon Holdings, Inc. ("Marmon Holdings").

12.  Group R, a Delaware corporation, filed a certificate of dissolution with that state in 2003.

13.  Marmon Holdings, as the sole shareholder of Group R, signed a Plan of Liquidation with Group R.  The Plan of Liquidation included a "Plan of Distribution to Creditors."

14. It is undisputed that Group R transferred its only asset, the RegO Residual Trust to Marmon Holdings.  The value of the asset is disputed by the parties.  Marmon

---

[1]A predecessor to Marmon Wire acquired 85% of Group R's (then Golconda Corporation) stock in 1974. In 1985, Marmon Wire purchased the remaining 15% and became Group R's sole shareholder.

Holdings argues the value is the book value of zero and the United States argues the value is what the interest was sold for in 2008 which was $44 million.

As to the history of the Environmental Protection Agency's ("EPA") actions and notifications for the Coeur d'Alene Basin and the Golconda Site, the Court makes the following undisputed factual findings:

In 1980, CERCLA was enacted. in 1983 the EPA designated the Bunker Hill Superfund Site on its CERCLA National Priorities List and noticed the listing in the Federal Register.  The EPA divided the Site into three operable units.

The EPA issued a Record of Decision for Operable Unit 1 in 1991 and Operable Unit 2 in 1992.

EPA issued an interim Record of Decision for Operable Unit 3 in 2002.  Unit 3 includes the former Golconda Mine and Mill operation.

It is undisputed that there was correspondence between the United States, Reg O Inc., Group R and Marmon Holdings between 1991 -1998 regarding the Golconda site. Defendants claim the United States never provided RegO or Group R with any actual notice of a potential CERCLA claim against it prior to any dividend payments being made by RegO and Group R.

Specifically, in 1991, the United States copied RegO in correspondence to GMC alleging inadequate response by GMC to prior EPA requests for documents.  RegO responded to the letter on June 19, 1991, providing the corporation history the Golconda

site and advising the EPA Group R is not conducting business any longer.  Group R was not dissolved at this time.

In 1997, the EPA tendered Information Requests pursuant to § 104 of CERCLA to Group R.

In August of 1997, the United States moved to amend the complaint in *United States v. Asarco, et al.*, Civ. Case No. 96-122-N-EJL, Dkt. 222, to add twenty-three defendants including Group R.  This motion was denied without prejudice by the Court in March of 1998.  *Id.* at Dkt. 340.

Defendants claim the United States did not communicate with Group R, Marmon Wire or Marmon Holdings regarding the Golconda Site again until 2008.

The Complaint in this matter was filed October 26, 2010, Dkt. 1. The United States brings suit against Marmon Holdings, seeking recovery of costs incurred in the clean-up of Unit 3 under 42 U.S.C. § 9607(a). The Court previously denied a motion to dismiss (Dkt. 25).  The Court held that the language of the Plan of Liquidation was ambiguous and that extrinsic evidence can be considered as evidence of the parties' intent to determine what section of Delaware corporation law the companies were attempting to dissolve the company pursuant to.  Additionally, the Court needed additional discovery on whether Marmon Holdings assumed direct liability for claims against Group R.

The parties stipulated to the dismissal of the second claim pursuant to the Fair Debt Collection Practices Act (Dkt. 63), so the Court will not address this claim.

**MEMORANDUM DECISION AND ORDER - 7**

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *See id*. at 248.

The moving party is entitled to summary judgment if that party shows that each issue of material fact is not or cannot be disputed. To show the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the

cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv*., 809 F.2d at 630-31 (internal citation omitted).

Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it." The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

# ANALYSIS

## A. CERCLA Liability

The Court finds there are genuine issues of material fact regarding whether or not "hazardous substances" as defined by CERCLA were or were not released at the mining site and whether those releases continue in to the present time.  The Court will weigh the testimony provided at trial on this issue, but the parties on are notice that this Court is very familiar with the Coeur d' Alene Basin's long history of mining and mine tailing releases as well as the EPA's clean up efforts in the Coeur d'Alene Basis based on other lawsuits that have been filed in the District of Idaho.  While the Court will reserve its ruling on whether the Golconda Site released "hazardous substances." the record before the Court on summary judgment supports the likelihood that the Court will determine that "hazardous substances" have been released from this site and that the EPA has incurred at least some response costs due to the releases from the Golconda site.

## B. Successor Liability

### 1.  General Overview

Under the Government's first claim for relief, it alleges that Group R was an "owner" and "operator" of the Golconda Site for CERCLA liability purposes through its ownership and operation of Golconda Corporation and Marmon Holdings is a "successor-in-interest" of the Golconda Corporation via its ownership of Group R and its

participation in Group R's Plan of Liquidation. The Government contends that the language of Group R's Plan of Liquidation is sufficient to render Marmon Holdings liable under CERCLA as the language supports a finding that Marmon Holdings assumed all the assets and liabilities of Group R.

Marmon Holdings argues the Government's position is a misapplication of the language in the Plan of Liquidation and Marmon Holdings did not expressly or impliedly assume the liabilities of Group R when it was dissolved. Marmon Holdings maintains Group R complied with Delaware corporate dissolution statutes and can no longer be sued since the current action was not brought within the three-year window for suing a dissolved corporation.

The Government responds that Marmon Holdings is subject to a ten-year window of liability because it expressly or impliedly assumed all the liabilities of Group R in the Plan of Liquidation, had knowledge of a potential CERCLA claim when Group R was dissolved in 2003 and failed to provide a plan for payment of these potential liabilities. The United States claims Group R did not comply with Delaware's safe harbor dissolution statute and the Plan of Liquidation should be interpreted in favor of potential claimants known or reasonably foreseeable at the time the Plan of Liquidation was executed.

As a preliminary matter, Defendants correctly note that the Ninth Circuit has not resolved whether state law or federal common law governs successor liability under CERCLA. *See Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.,* 159 F.3d

358, 364 (9th Cir. 1998).  As in *Atchison*, this Court need not decide whether federal or state law controls, because the Amended Complaint alleges that Marmon Holdings expressly assumed liability through the Plan of Liquidation.  Express assumption of liability is a standard basis for successor liability recognized both in federal common law and in Delaware law.  *See id.* at 361 (holding under federal common law, successor liability is created when "[t]he purchasing corporation expressly or impliedly agrees to assume the liability."); *Great American Ins. Co. of New York v. TA Operating Corp.*, No. 06 Civ. 13230, 2008 WL 1848946, at *3 (S.D.N.Y. April 24, 2008) (recognizing that under Delaware law liability attaches when "the successor expressly or impliedly assumed such liability.").

        In order to analyze the arguments of the parties, the Court needs to discuss the corporate dissolution process under Delaware law.  Delaware corporate law was amended in 1987 to add "safe harbor" dissolution provisions.  In general pursuant to Tit. 8 Del Code § 279, provides all dissolved corporations shall be continued for three years from the date of expiration to wind up its affairs and the Court of Chancery can extend the period of time for the purpose of prosecuting and defending lawsuits.  Section 279 also provides that any action, suit or proceeding begun against the corporation either prior to or within the three year window, shall not abate by reason of the dissolution of the corporation.  It is undisputed that the United States did not seek and extension of the three year window or initiate its claims against Group R or Marmon Holdings within three years from the date of dissolution in 2003.

Pursuant to Delaware law, a corporation may elect to give notice pursuant to Del. Code Ann. tit. 8, § 280 to "all persons having a claim against the dissolved corporation. . . ."  There are specific requirements to be included in the notice as well as a duty to publish the notice.  *Id.*  If the notice statute is complied with, no new claims against the corporation can be filed after a certain deadline.

If a dissolved corporation does not follow the notice requirements of § 280 as well as the requirements of § 281(a), then the dissolved corporation does not have the protections of the "safe harbor" from claimants.  It is undisputed in this case that Group R did not follow the notice requirements of § 280.

Therefore the Court must determine if Group R complied with the requirements of § 281(b) which provides:

> A dissolved corporation or successor entity which has not followed the procedures described in § 280 of this title shall, prior to the expiration of the period described in § 278 of this title, adopt a plan of distribution pursuant to which the dissolved corporation or successor entity (I) shall pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured contractual claims known to the corporation or such successor entity, (ii) shall make such provision as will be reasonably likely to be sufficient to provide compensation for any claim against the corporation which is the subject of a pending action, suit or proceeding to which the corporation is a party and (iii) shall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the corporation or that have not arisen but that, based on facts known to the corporation or successor entity, are likely to arise or to become known to the corporation or successor entity within 10 years after the date of dissolution. The plan of distribution shall provide that such claims shall be paid in full and any such provision for payment made shall be made in full if there are sufficient assets. If there are insufficient assets, such plan shall provide that such claims and obligations shall be paid or provided for according to their

priority and, among claims of equal priority, ratably to the extent of assets legally available therefor. Any remaining assets shall be distributed to the stockholders of the dissolved corporation.

Stated simply, this statute requires a dissolved corporation to adopt a plan of distribution within three years of the date of dissolution which provides the dissolved corporation or successor entity:

> 1. to pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured contractual claims known to the corporation or such successor entity;

> 2. to pay or make reasonable provision to pay all pending actions, suits or proceedings; and

> 3. to make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the corporation or that have not arisen but that, based on facts known to the corporation or successor entity, are likely to arise or to become known to the corporation or successor entity within 10 years after the date of dissolution.

It is this third requirement that the Government claims was not satisfied by the Plan of Liquidation adopted by Group R. The disagreement between the parties turns on interpretation of the 2003 Plan of Liquidation signed by Group R and Marmon Holdings. The Plan of Liquidation includes a section titled "Plan of Distribution to Creditors," which restates in entirety the language of § 281(b) of Delaware's General Corporation Law.  This statutory language is followed by one sentence of unique language, which provides that claims against Group R "may be made by obtaining an undertaking from [Marmon Holdings] to return such part, or all, of any distribution(s) . . . as is necessary in

order to pay or provide compensation for such claims and obligations."

The Government contends the unique language added to the Plan of Liquidation beyond the statutory language of § 281(b) amounts to a direct assumption of liability by Marmon Holdings.  Defendants counter that this language, particularly when read in the context of state law requirements concerning shareholder liability, only commits Marmon Holdings to return disbursements in the event of a judgment against Group R itself.

Because the Plan of Liquidation was drafted by the parties under Delaware law, the Court applies principles of contract interpretation from that state. "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1222 (Del. 1997).  A contract is ambiguous if it is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  *Phillips Home Builders, Inc. v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del. 1997) (quotations omitted).  When there is ambiguity, the reviewing court may consider extrinsic evidence of the parties' intent.  *Eagle Indus., Inc.*, 702 A.2d at 1232.[2]

Whether the language of a contract is ambiguous is a question of law.  *In re U.S. Financial Securities Litigation*, 729 F.2d 628, 632 (9th Cir. 1984).  The parties' intent,

---

[2] These principles of contract interpretation are the same as those that would be applied under federal law.  *See Pierce Cnty. Hotel Emp. & Restaurant Emp. Health Trust v. Elks Lodge*, 827 F.2d 1324, 1327 (9th Cir. 1987) ("Extrinsic evidence is inadmissible to contradict a clear contract term, but if a term is ambiguous, its interpretation depends on the parties' intent at the time of the contract's execution, in light of earlier negotiations, later conduct, related agreements, and industrywide custom[.]") (internal citations omitted).

determined through extrinsic evidence, is a question of fact.  *Id.*

Applying these principles, the Court looks first to the plain language of the Plan of Liquidation.  The Court finds that there is ambiguity as to whether its language exposes Marmon Holdings to direct liability.  The Plan of Liquidation commits Group R to "make such provision as will reasonably be likely to be sufficient" to compensate claims likely to "arise or to become known to the Company within 10 years after the date of dissolution."  The Plan of Liquidation then states that "[p]rovision for such claims and obligations may be made by obtaining an undertaking from the sole stockholder" to return distributions received during dissolution."

As discussed in the Court's Memorandum Decision and Order on the motion to dismiss, this language might mean that Marmon Holdings is only obligated to return distributions in the event of a judgment against Group R.  But it might also be read to mean Marmon Holdings "undertaking" commits it to direct liability for claims against Group R once that corporate entity ceased to exist.  The Plan of Liquidation is silent as to whether Marmon Holding's duty to provide compensation encompasses the duty to defend against such claims.  Because the language of the Plan of Liquidation is susceptible to multiple reasonable interpretations, the Court finds it should consider extrinsic evidence to determine the intent of the parties to the Plan of Liquidation: the officers of Group R and the sole shareholder of Group R, Marmon Holdings.[3]

---

[3] It is clear from the language of the Plan of Liquidation that if Marmon Holdings is directly liable, its liability is limited to the extent of distributions made to it during Group R's

The Plan of Liquidation was signed by R.C. Gluth as a Director for Group R.  Mr. Gluth is deceased.  The Plan of Liquidation was also signed by Marmon Holdings' Secretary, Mr. Robert Webb.  Mr. Webb has filed an affidavit indicating that it was not the intention of Marmon Holdings to assume the liabilities of Group R.

As Defendants emphasize, Delaware law can also be looked to for intent given that the Plan of Liquidation incorporates § 281(b) of Delaware's General Corporation Law nearly verbatim.  *See* Del. Code Ann. tit. 8, § 281(b).  Unfortunately, Delaware law does not deal squarely with the issue before the Court.  Section 281(b) operates against the backdrop of § 278, which provides that a dissolved corporation continues to exist as a legal entity for three years after its dissolution, solely "for the purpose of prosecuting and defending suits." § 278.  Sections 280 and 281(b) offer two alternative avenues through which a dissolved corporation may provide for potential claims by creditors during this winding down period.  The purpose of these statutes is to "balance the competing public policy interests of ensuring that claimants against the corporation had a time period in which to assert claims against the dissolved corporation and ensuring that directors, officers, and stockholders of a dissolved corporation could have repose from claims regarding the dissolved corporation." *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 789 (Del. Ch. 2007).

---

dissolution.  Defendants assert that this limited liability is completely different than direct CERCLA liability.  The Court agrees and by analogy to a merger  there is no reason that the contractual assumption of liability cannot be limited in scope by the parties.  *See, e.g., Inamed Corp. v. Medmarc Cas. Ins. Co.*, 258 F. Supp. 2d 1117, 1124-25 (C.D. Cal. 2002) (examining terms of merger agreement to determine extent of successor liability).

The parties acknowledge there is an apparent gap in the corporate dissolution statutory scheme of Delaware.  Section 278 extends the life of a dissolved corporation for three years, while § 281(b) requires that the corporation make provision for claims that could arise against the dissolving corporation within ten years.  When a corporation does not comply with § 281(b) by making provision "reasonably likely to be sufficient," and a claim arises within the seven year window after the corporation has ceased to exist, it is not clear who, if anyone, remains liable.

Delaware courts have yet to address this statutory gap.  The Court cannot find any Delaware case law that interprets § 281(b) as imposing successor liability in this circumstance.  However, the Court is also unable to find any precedent that squarely refutes the Government's interpretation.  The Delaware courts have not resolved the dissonance between the three year wind up period in § 278, and the ten year window in which the dissolved corporation must make provision for claims under § 281(b).

In looking to the extrinsic evidence of the intent of parties executing the Plan of Liquidation, the Court has been provided with the affidavits of Marmon's General Counsel at the time, Mr. Robert Webb, and outside attorney who drafted the Plan of Liquidation, Ms. Miranda Mandel.  These two individuals attest that it was not the intent of Group R or the sole shareholder of Group R in 2003 Marmon Holdings, that Marmon Holdings would assume all liabilities of Group R by adopting the undertaking provision referenced in the Plan of Liquidation.  The Government suggests the testimony of these two individuals should not be given any weight as the explanations of the attorneys is

simply to avoid liability and avoids the reality that Group R and Marmon Holdings was aware or should have been of a reasonably foreseeable CERCLA claim when Group R was dissolved in 2003.

The Court finds there is a genuine issue of material fact regarding the intent of the parties in language used in the Plan of Liquidation.  The Court is concerned with the affidavits of the attorneys for a number of reasons.  First, for purposes of a motion for summary judgment, the Court cannot weigh the credibility of the witnesses via their affidavits.  Second, it does appears that the statements are somewhat self-serving since the  attorneys are using hindsight to interpret their actions to avoid any liability to their clients.  Third, since the Plan of Liquidation was not a bilaterally negotiated agreement, the "intent" of the drafter may not be relevant since any ambiguities in the Plan should arguably be construed against the drafter.  See *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). Fourth, outside counsel admitted she was not aware of a potential CERCLA claim when she drafted the Plan of Liquidation.  Fifth, there is evidence in the record that could support the Court finding that some corporate officers involved were aware or should have been aware of a potential CERCLA claim at the time Group R was dissolved in 2003.   For these reasons, the Court finds the motion for summary judgment on the issue of interpreting the Plan of Liquidation must denied. The Court must hear the testimony and weigh the credibility of the witnesses to determine if there was or was not an assumption of liabilities by Marmon Holdings.

### 2. Interpretation of Delaware Corporate Statutes

Additionally, the Court finds there are genuine issues of fact regarding the alternative issue of if Marmon Holdings did not assume the liabilities of Group R, did Group R's Plan of Dissolution satisfy the Delaware statute's "minimum requirements" of § 281(b) such that Plaintiff cannot seek to bring an action against Marmon Holdings as the three year window has passed.

The recent Delaware opinion *In the Matter of Krafft-Murphy Company, Inc.*, ___ A.3d ___, 2011 WL 5420808 (Del. Ch. Nov. 9, 2011), is helpful to the Court in setting out how the Delaware corporate dissolution sections relate to each other.  In *Krafft-Murphy*, the court found if a corporation fails to follow one of the two alternative statutory dissolution procedures, its directors may be subject to personal liability for breach of fiduciary duties to later claimants against the company and "if former shareholders may be liable for the full amount distributed to them in the dissolution." *Id.* at *7.  The court also held the purpose of § 281(b) is "on creating an obligation for the corporation to provide compensation for reasonably foreseeable future claimants." *Id.* at *12.

In reviewing the Plan of Dissolution along with the affidavits provided by Defendants, the Court cannot determine if Group R did anything more than say it would have a plan if claims were made against it after it dissolved.  There is no other written agreement that sets forth how Group R would reclaim the distributed assets from Marmon Holdings if a claim was made.  As a matter of law, the Court cannot determine without

additional testimony if the Plan of Dissolution satisfies Delaware law.  If the Plan of Dissolution does not satisfy the minimum requirements for the safe harbor dissolution, then Marmon Holdings and Group R may not be able to claim the shields provided by the statute.

*Krafft-Murphy,* also leaves open the question for this Court that even if the Court determines if Plaintiff cannot recover against Marmon Holdings, it may be possible for Plaintiff to ask a Delaware court to create a receiver for Group R so that Plaintiff can seek a judgment against Group R and then with a judgment in hand, then seek to reclaim the value of the assets distributed to Marmon Holdings.

### 3.  Notice of Potential CERCLA claim

The Court finds the factual issue of whether Group R knew or should have known of a potential CERCLA claim at the time it dissolved is disputed by the parties.  If Group R's officers and directors, knew or should have of known of a potential claim, then this will factor in to the Court's analysis of the Plan of Dissolution and whether the plan satisfied the Delaware safe harbor provisions for dissolving a corporation and if the ten year window for future claims under § 281(b) applies making the present CERCLA claim timely filed.

**4.  Value of Distribution to Marmon Holdings**

The Court also finds genuine issues of material fact prevent summary judgment on the issue of the value of the distributed assets to Marmon Holdings.  If Plaintiff can establish that Marmon Holdings can be sued as a successor in interest under the Delaware corporate dissolution statutes and there is CERCLA liability, then it appears undisputed that the liability of Marmon Holdings is limited to the value of the assets distributed to it from Group R.  Stated another way, it appears to the Court the parties agree that as a matter of Delaware corporate law pursuant to § 282,  the amount of liability would be capped at the value of the distribution Marmon Holdings received from the dissolution of Group R.

Group R distributed its sole asset to Marmon Holdings when it dissolved in 2003.  It appears undisputed that the distributed asset was the residual interest in the RegO Claimants Trust.  The value of the residual interest when it was distributed is disputed and the Court will have to determine what value should be placed on that asset if the Plaintiff is allowed to seek recovery from Marmon Holdings.  Plaintiff argues the value of the asset should be the $44 million it was sold for in 2008.  Defendant argues it is the value as of the date of dissolution and the value is much lower and may be zero.  Marmon Holdings objects to the 2008 transaction as being viewed as an arms length transaction and that any increase in value from the date of distribution should be not considered by the Court.  Marmon Holdings also challenges the assumptions of Plaintiff's expert on the

valuation. These disputed facts must be resolved after the Court has heard the testimony regarding the valuation of the residual interest by both experts.

### 5.  Transfer of Mining Assets

The next genuine issue of material fact that prevents summary judgment is whether there can be one or more successors in interest.  Defendants maintain the Court should follow the corporation that continued to manage and own the mining property, not the shareholder of a corporation that briefly owned the mining property as well as other assets and did not specifically operate the mine.  CERCLA casts a wide net for liability of any former "owner or operator" of a mining site that has been determined to have been responsible for hazardous substance releases.  *In re Acushnet River & New Bedford Harbor*, 712 F. Supp. 1010 (D. Mass. 1989), the court held that Congress certainly did not intend to deny the government recourse against polluters simply because intervening transactions might make the corporate entity that caused the pollution unavailable to meet the costs of remediation.  *See also, Louisiana -Pacific Corp. v. ASARCO, Inc.*, 909 F.2d 160, 1261 (9th Cir. 1990).

While the Court finds the evidence is not generally disputed regarding historical mining operations at the Golconda Site, the Court also finds the record in this matter is disputed regarding what mining assets were sold or transferred to Harry Magnuson and whether the settlement in 2012, resolved all CERCLA claims related to the Golconda Site.  Therefore summary judgment on the issue of liability under CERCLA must be

denied.  The parties must clarify through specific evidence what mining assets were

owned by Group R (or its predecessors) and for what amount of time did Group R (or its

predecessors) own the mining assets.  If hazardous substances were released from the

mining site during the ownership of the site by Group R or its corporate predecessors,

potential CERCLA liability attaches to Group R as a successor in interest and potentially

to Marmon Holdings as the shareholder of Group R who received assets from the

dissolved corporation.


**6. Laches**

Finally, the issue of a laches defense is based on disputed issues of fact and

summary judgment cannot be granted on this issue. .  Laches is an equitable defense but

is based on what knowledge the plaintiff had in delaying a legal claim.  *Petrella v. Metro-

Goldwyn-Mayer, Inc.*, ___ F.3d ___, 2012 WL 3711706 (9th Cir. Aug. 29, 2012).

Dismissal based on laches is appropriate when "(1) the plaintiff delayed in initiating the

lawsuit; (2) the delay was unreasonable; and (3) the delay resulted in prejudice." *Id.*

Here, it is disputed by the parties if the United States was or was not dilatory in filing the

present action and whether the delay was unreasonable. The United States claims without

knowledge of the dissolution by Group R, it was prevented from filing the action earlier.

Marmon Holdings points out that the United States could have filed this lawsuit when it

was not allowed to add Group R as a defendant to another Coeur d'Alene Basin case.

There are certainly facts that can be interpreted to support a finding the Plaintiff has been

dilatory, but there are also facts to support a finding that while there was a delay, the delay was not beyond the statutory limits for CERCLA actions.

## CONCLUSION

For the reasons stated above, the genuine issues of material fact exist that prevent the Court from granting any of the motions for summary judgment and the matter must proceed to trial.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (Dkt. 38) is **DENIED**.

2. Plaintiff's Motion for Summary Judgment on Issue of Group R's Liability (Dkt. 39) is **DENIED**.

3. Plaintiff's Motion for Summary Judgment on Issue of Liability of Defendant Marmon Holdings, Inc. To Pay Group R Co. Inc's Liability under CERCLA (Dkt. 42) is **DENIED.**

DATED:  **December 5, 2012**

Honorable Edward J. Lodge
U. S. District Judge