IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | Civ. No. 2:10-cv-00526-EJL-CWD |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM DECISION** |
| v. | ) | **AND ORDER** |
| | ) | |
| MARMON HOLDINGS, INC. and | ) | |
| MARMON WIRE & CABLE, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court is the resolution of the bench trial on this matter. The parties requested additional time to have the transcript prepared before filing closing briefs. The briefs as well as supplemental authorities have now been filed and the Court is prepared to issue its finding of facts and conclusions of law.

**Procedural Background**

This case concerns Defendants' liability under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") for mining related pollution within the Bunker Hill Mining and Metallurgical Complex Superfund Site ("Bunker Hill Superfund Site") in northern Idaho.

In 1927, Golconda Lead Mines, Inc. founded the Golconda Mine and Mill near Lake Coeur d'Alene. The operation of the mine resulted in the release of hazardous substances into the Coeur d'Alene Basin watershed. Through a series of mergers and name changes, Golconda Lead Mines, Inc. became Group R. Co., Inc. ("Group R"). In 1985, Defendant Marmon Wire & Cable, Inc. ("Marmon Wire") became the sole

shareholder of Group R. Subsequently, between 1986 and 1988 Group R transferred its assets to Marmon Wire, leaving Group R insolvent. Marmon Wire then transferred the stock of Group R to its parent corporation, Defendant Marmon Holdings, Inc. ("Marmon"), in 1991.  Group R, a Delaware corporation, filed a certificate of dissolution with that state in 2003. Marmon, as the sole shareholder, signed a Plan of Liquidation with Group R. The Plan of Liquidation included a "Plan of Distribution to Creditors." As part of the Plan of Liquidation, Group R assigned its residuary interest in the RegO Claimants Trust Agreement to Marmon.

Meanwhile, in 1983 the Environmental Protection Agency ("EPA") designated the Bunker Hill Superfund Site on its CERCLA National Priorities List and noticed the listing in the Federal Register. The EPA divided the Site into three operable units.  The EPA issued a Record of Decision for Operable Unit 1 in 1991 and Operable Unit 2 in 1992.  EPA issued an interim Record of Decision for Operable Unit 3 in 2002. (*Id.* ¶ 30.) Unit 3 includes the former Golconda Mine and Mill operation.

The remaining claim to be resolved by this Court is the United States' claim against Marmon, seeking recovery of costs incurred in the clean-up of Unit 3 under 42 U.S.C. § 9607(a) as successor in interest to Group R.

## Findings of Fact

**Stipulated Facts.**

The parties stipulated to the following facts which the Court adopts:

### <u>Activities of Golconda Lead Mines, Inc.</u>

1. Golconda Lead Mines, Inc. was incorporated in Idaho in January 1927.

2. The Golconda mine and mill property (Golconda Property) is located within Operable Unit 3 of the Bunker Hill Mining and Metallurgical Complex Superfund Site (Bunker Hill Site) in the Coeur d'Alene Basin in northern Idaho.  More specifically, the Golconda Property is located along the South Fork of the Coeur d'Alene River, within the township of Mullan, and approximately 2 miles east of Wallace, Idaho.

3. The Golconda Property is a "facility" within the meaning of CERCLA.

4. From 1927 to 1962, Golconda Lead Mines, Inc. owned the Golconda Property. As a result of the corporate name change of Golconda Lead Mines to Golconda Mining Corporation in 1962, Golconda Mining Corporation then owned the Golconda Property.

5. On November 8, 1976 Golconda Corporation (identified in Stipulation No. 16 and 19) and the Golconda Mining Corporation 1970 (identified in Stipulation No. 24) transferred the Golconda Property to Harry Magnuson.  On November 30, 1976 Harry Magnuson transferred the Golconda Property to Golconda Mining Corporation 1970.  Golconda Mining Corporation 1970 owns the Golconda Property today.

6. From 1927 until 1957, Golconda Lead Mines, Inc. conducted mining operations at the Golconda Property.  No mining operations were conducted after 1957.

7. From 1928 until 1960, Golconda Lead Mines, Inc. conducted milling operations at the Golconda mill, which was located on the Golconda Property. After 1960, neither Golconda Lead Mines, Inc., nor Golconda Mining Corporation conducted milling operations at the Golconda mill.

8. During the time of the mining and milling operations described in the preceding paragraphs, Golconda Lead Mines, Inc., was an owner and an operator within the meaning of CERCLA.

9. Cadmium, lead and zinc are hazardous substances within the meaning of CERCLA.

**EPA's Activities and cleanup costs**

10. The Bunker Hill Site consists of three "Operable Units."

11. Operable Units 1 and 2 are located within a twenty-one square mile area referred to as "the Box."

12. Operable Unit 3 consists of areas outside the Box where mining and milling related contamination has come to be located in the Coeur d'Alene Basin.

13. As a result of response actions conducted at the Bunker Hill Site, the Environmental Protection Agency (EPA) has incurred response costs related to Operable Unit 3.

14. In this litigation, the United States seeks response costs incurred and to be incurred by the United States in connection with Operable Unit 3. In this litigation, the United States does not seek response costs incurred in the Box.

15. Consistent with the case management order in this matter, Phase 2 of this lawsuit will involve issues relating to the amount of costs incurred in connection with Operable Unit 3, but not the Box, as well as any issues relating to whether the harm is divisible.

**Corporate history**

16. On or about March 23, 1962 Golconda Lead Mines, Inc. changed its name to Golconda Mining Corporation.

17. The entity described in the previous Paragraph owned mining properties in the Coeur d'Alene mining district, including the Golconda Property, as well as stock in other mining companies.

18. In 1966 Golconda Mining Corporation's registration as a non-diversified closed-management investment company under the Investment Company Act of 1940 became effective.  At this time, Golconda had no active corporate activities other than the ownership of mining properties in the Coeur d'Alene mining district, including the Golconda Property and mining claims and improvements, as well as shares in other mining companies.

19. On September 10, 1970, Golconda Mining Corporation amended its Articles of Incorporation to change its name to Golconda Corporation.

20. On September 15, 1970, the entity now named Golconda Corporation merged with Astro Controls, Inc.  Golconda Corporation was the surviving entity.

21. Plaintiff's Exhibits 19 and 23 are true and correct copies of the Plan and Agreement of Merger of Astro Controls, Inc., into Golconda Mining Corporation.

22. As a result of the September 15, 1970, merger, Golconda Corporation acquired a number of manufacturing divisions and entities.  Specifically, Golconda Corporation acquired the following: the RegO Division (manufacturer of valves and regulators); Anderson Copper & Brass (manufacturer of brass fittings); Pioneer Astro (components for aircraft and computers); Bastian-Blessings (service equipment for retailers and restaurants).  These newly acquired manufacturing entities and divisions did not conduct mining activities in Coeur d'Alene, Idaho.

23. As a result of the merger with Astro Controls, Golconda Corporation's primary business focus became the manufacturing entities and divisions it acquired through the merger.

24. Golconda Mining Corporation was incorporated in Idaho on September 15, 1970 (hereinafter "Golconda Mining Corporation 1970") as a subsidiary of Golconda Corporation (as identified in Stipulation Nos. 16 and 19).

25. On November 12, 1970, Golconda Mining Corporation 1970 entered into a subscription agreement with Alice Consolidated Mines, Inc. allowing it to purchase 10,000 shares of Alice Consolidated Mines, Inc.

26. From at least 1956 until September 1970, Golconda Mining Corporation (including when it had the name Golconda Lead Mines) operated out of the

Scott Building in Wallace, Idaho.  From September 1970 until at least 1991 Golconda Mining Corporation 1970 operated out of that same building.

27. Wray Featherstone became the president of Golconda Lead Mines, Inc., in 1956.  Mr. Featherstone was a director on its board since at least 1959 until 1985 and a shareholder from at least 1965 until 1985 (during which times it also had the name Golconda Mining Corporation, Golconda Corporation, RegO Company, and The RegO Group, Inc.).  He was in those positions at the time of the 1970 merger with Astro Controls.  Once Golconda Mining Corporation 1970 incorporated, Mr. Featherstone became the president and a director of that corporation and served in both those positions until at least 1990.

28. Harry Magnuson was a vice president and a director of Golconda Lead Mines, Inc., since at least 1956 until 1969 (during which time the company also had the name Golconda Mining Corporation).  In 1971, Mr. Magnuson became the vice president and a director of Golconda Mining Corporation 1970 and served as a director until at least 1990.  In 1971, Mr. Magnuson also returned to the board of the company now known as Golconda Corporation and remained as a director until 1985 (during which time it also had the name RegO Company and later the RegO Group, Inc.).  Mr. Magnuson was also a shareholder of Golconda Lead Mines, Inc., (later known as Golconda Mining Corporation, Golconda Corporation, RegO Company, and the RegO Group, Inc.) from at least 1965 until 1985.

29. In 1976, Golconda Corporation sold the stock of Golconda Mining Corporation 1970, along with all of its mining assets, including the Golconda Property, to Harry Magnuson for $175,000.

30. On June 17, 1977, Golconda Corporation merged with RegO Company, which was a Delaware corporation.  RegO Company was the surviving entity. Plaintiff's Exhibit 44 is a true and correct copy of the merger agreement.

31. On February 7, 1978, RegO Company changed its name to The RegO Group, Inc. (RegO Group).

32. On the same date, RegO Group contributed the assets of its RegO Division to its wholly owned subsidiary, RegO Company (hereinafter RegO Company 1978).

33. On June 24, 1985, RegO Group merged with MR Subsidiary, Inc.  RegO Group was the surviving corporation.  Plaintiff's Exhibit 46 is a true and correct copy of the merger agreement.

34. On December 23, 1992, RegO Group changed its name to Group R Co., Inc. (Group R).

## Communications Between the EPA and Marmon and Group R

35.  The following Exhibits are true and correct copies of correspondence between the United States, Group R, and/or Marmon relating to the Golconda Property. The Parties stipulate that each of these exhibits is authentic and admissible evidence in this lawsuit.

a.  March 5, 1991 Letter from EPA to Golconda Mining Corporation 1970 regarding CERCLA § 104(e) information request, cc'ing "RegO,Inc." at the address of Group R and Marmon in Chicago, Illinois. [Pl. Ex. 058; Def. Ex. 239];

b.  June 19, 1991 Letter from Group R to EPA in response to March 5, 1991 Letter [Pl. Ex. 060; Def. Ex. 241];

c.  June 24, 1997 Letters from EPA requesting information pursuant to § 104(e) of CERCLA from Group R and Marmon Group, Inc. [Def. Ex. 255];

d.  July 25, 1997 Group R written response provided to EPA's June 24, 1997 CERCLA § 104(e) Information Request [Pl. Ex. 065; Def. Ex. 337 (with other responses)];

e.  July 29, 1997 Letter from Group R to DOJ [Pl. Ex. No. 066];

f.  August 13, 1997 Letter from Group R to DOJ providing additional information [Pl. Ex. 067; Def. Ex. 256];

g.  August 21, 1997 Letter from EPA to Group R regarding notice that EPA is recommending addition of Group R as a defendant to CERCLA action [Pl. Ex. 069; Def. Ex. 243];

h.  August 21, 1997 Letter from EPA to Marmon Group, Inc. stating that EPA is not recommending addition of Marmon Group as defendant to CERCLA action.   [Def. Ex. 242];

i.  August 29, 1997 United States files motion to amend complaint to add Group R as a defendant to March 22, 1996 CERCLA complaint. [Pl. Ex. 102; Def. Ex. 261];

j.  September 29, 1997 Letter from DOJ to Group R regarding Informational Settlement Meeting to be held in October 1997 [Pl. Ex. 070];

k.  March 31, 1998 Court issues Order denying United States' motion for leave to file amended complaint, without prejudice [Pl. Ex. 103; Def. Ex. 263];

l.  June 5, 1998 Letter from DOJ to Group R regarding proposed settlement framework [Pl. Ex. 071;  Def. Ex. 259];

m.  June 24, 1998 Letter from Group R to DOJ responding to June 5, 1998 letter [Def. Ex. 260];

n.  March 7, 2008 Letter from EPA requesting information pursuant to § 104(e) of CERCLA from Group R [Pl. Ex. 073; Def. Ex. 338 (with other responses)];

o.  June 24, 2008 104(e) response from Group R to EPA's March 7, 2008, CERCLA § 104(e) information request.  [Pl Ex 074].

36. The first contact from EPA to Group R, regarding the Bunker Hill Site, was through a letter dated March 5, 1991.  That letter was addressed to Golconda Mining Corporation 1970 with a copy to "Rego, Inc." and was received at the

offices of Marmon Corporation in Chicago, Illinois. At that time, Group R was named RegO Group, Inc., and was a subsidiary of the Marmon Corporation.

37. In that letter, the EPA was following up on a prior letter to Golconda Mining Corporation 1970 and requested additional information with respect to purported mining activities, as well as present or past ownership and operation of mining properties, within the Bunker Hill Site.

38. By letter dated June 19, 1991, Marmon Corporation (through counsel) responded to the March 5, 1991 Letter. Marmon Corporation provided information regarding the corporate history of Group R and advised the EPA that its view was that "the legal successor in interest to the original Golconda Lead Mines is Golconda Mining Corporation (1970)." Marmon Corporation also advised the EPA that Group R was no longer conducting business.

39. In June 1997, EPA served Group R (through their registered agents) with information requests pursuant to § 104(e) of CERCLA, and Group R provided a written response to the information request, dated July 25, 1997. This information request was the first written communication to Group R by the United States regarding Bunker Hill since 1991.

40. In a letter dated August 13, 1997, Group R, through counsel, provided further information to the United States Department of Justice regarding the corporate history of Group R, and its alleged connection to Golconda Lead Mines, Inc., and also informed the United States that Group R was an inactive company.

41. Through letter dated August 22, 1997, the EPA informed Group R that it decided to recommend that Group R be added as a defendant to *United States v. Asarco*, Docket No. 96-122 (D. Idaho).

42. Through letter dated August 22, 1997, the EPA informed "The Marmon Group, Inc." that it was not recommending that "The Marmon Group, Inc." be added as a defendant to *United States v. Asarco*, Docket No. 96-122 (D. Idaho).

43. On August 29, 1997, the United States filed a motion seeking leave to amend the complaint in *United States v. Asarco*, Docket No. 96-122 (D. Idaho) to include, *inter alia*, Group R as a defendant.  On March 31, 1998, this Court denied the United States' motion without prejudice.

44. By letter of June 5, 1998, the United States Department of Justice proposed terms of settlement to Group R.  By letter dated June 24, 1998, Group R (through counsel) responded to the EPA's June 5 letter.

45. The United States' June 5, 1998 letter was the last written communication from the United States to Group R with respect to the Bunker Hill Site until on or about March 7, 2008, when the EPA propounded information requests on Group R pursuant to § 104(e) of CERCLA**.**

46. On June 24, 2008, Group R provided a written response to EPA's March 7, 2008 CERCLA § 104(e) information request.

**Dissolution of Group R**

47. On June 30, 1991, Marmon purchased Group R (known as RegO Group at the time) from its subsidiary Marmon Corporation and became the sole shareholder of Group R.

48. On June 30, 2002 Marmon transferred Group R to Transition Holdings, LLC. ("Transition").

49. Transition is a wholly owned subsidiary of Marmon.

50. On July 30, 2003 Transition transferred Group R back to Marmon.

51. On July 31, 2003 Group R elected to dissolve under § 281(b) of Delaware General Corporation law.

52. Marmon and Group R first informed EPA that the certificate of dissolution for Group R was filed on July 31, 2003 in the June 24, 2008 information request response submitted to EPA.

53. At the time of Group R's dissolution, Group R had two officers: Mr. Robert Webb and Mr. Robert Gluth.

54. At the time of Group R's dissolution, Mr. Gluth was the sole Director of Group R.

55. Robert Webb is the General Counsel of the Marmon Group LLC and has served in that position since 1986. Marmon Group LLC is a subsidiary of Marmon and it provides administrative, consulting, and legal services to Marmon and its subsidiaries. Mr. Webb also served as Secretary and General Counsel of Group R from 1986 through the time of its dissolution.

56. On July 31, 2003, the *Joint Unanimous Written Consent of the Sole Director and Sole Stockholder of Group R Co., Inc.*, was signed by Mr. Webb, on behalf of Marmon as Group R's sole shareholder, and by Mr. Gluth, as Group R's sole Director.

57. Group R made a distribution of the residuary interest in the RegO Claimants Trust to Marmon on July 31, 2003.

58. The United States has not petitioned the Court of Chancery of Delaware to make Group R amenable to suit.

59. Other than the August 1997 motion to amend the complaint to add Group R as a defendant to a CERCLA action, which was denied by this Court without prejudice in March 1998, Group R has not been sued by the United States with respect to response costs incurred at the Bunker Hill Site, and the United States does not have a judgment against Group R.

**RegO Claimants Trust**

60. Throughout the 1980s, Group R owned a wholly owned subsidiary, RegO Company 1978, a Delaware corporation.

61. During that time, RegO Company 1978 manufactured valves and regulators.

62. In 1989 RegO Company 1978 dissolved pursuant to the procedure set forth under §§ 280 and 281(a) of Delaware General Corporation Law, and in 1992, the Delaware Chancery Court approved the proposed establishment of the RegO Claimants Trust to pay future products liability claims.

63. When the RegO Claimants Trust was established, Group R obtained a residuary interest in the Trust that would entitle it to the remaining Trust assets, if any, at the termination of the Trust.

64. The RegO Claimants Trust is still in existence and no claims assertion date has been set by the Trustee.

65. The RegO Claimants Trust has paid some settlements to claimants over its twenty year existence, but the Trust's corpus has increased from the time of its establishment in 1992 to the present.

66. Group R recorded the residuary interest at $0 on its financial records.

67. While having ownership of the residuary interest, Marmon recorded the residuary interest at $0 on its consolidated financial statements.

68. The Trust corpus on December 31, 2002 was $43,046,190.

69. The Trust corpus on December 31, 2007 was $47,332,038.

70. On February 24, 2008, Marmon sold the residuary interest in the RegO Claimants Trust to Claudco, LLC for a purchase price of $44 million. Like Marmon, Claudco is affiliated with the Pritzker Organization**.**

**Miscellaneous**

71. In January 2012, this Court approved a consent decree between the United States and, *inter alia*, Golconda Mining Corporation 1970 to settle the United States' CERCLA claims against Golconda Mining Corporation 1970 in connection with the Bunker Hill Site.

72. Harry Magnuson died in 2009.

73. Wray Featherstone died in 2000.

74. Robert Gluth died in 2011.

**Additional Factual Findings by the Court as to Disputed Matters:**

75. During the time of the mining and milling operations by Golconda Lead Mines, Inc., Golconda Lead Mines, Inc., was an "owner" or "operator" within the meaning of § 101(2) of CERCLA and there were historical disposals of hazardous substances, including cadmium, lead and/or zinc within the meaning of § 101(14) of CERCLA, at and from the Golconda mine and mill property,

76. These disposals constituted releases, or threats of releases, of "hazardous substances," including cadmium, lead and/or zinc, within the meaning of § 101(14) of CERCLA at and from the Golconda mine and mill property which would be a "facility" within the meaning of § 101(9) of CERCLA.

77. The United States has incurred some response costs in responding to the releases at the Golconda mine and mill property as well as in responding to releases of commingled tailings downstream of the Golconda mine and mill property.

78. The reversionary interest in the RegO ClaimantsTrust had an actual value of at least $40,000,000 and more likely up to $43,046,190 prior to the dissolution of Group R on July 31, 2003. The Court need not determine the exact amount with certainty as CERCLA damages against Group R have not been determined at this time.

79. After weighing the credibility of witnesses and the admitted exhibits there were sufficient facts to have put the officers and attorneys of Group R on notice of potential CERCLA liability in the future at the time Group R was dissolved.  General Counsel's argument that "he forgot" the earlier information is not a defense to the argument Group R's agents knew or should have known at the time Group R was dissolved there was the potential for CERCLA claims by the United  States or other responsible parties seeking contribution.  (See Findings of Fact 35-46.)

**Conclusions of Law**

There are several legal questions that must be answered in order to determine if the United States recover against Marmon as a "successor in interest" to Group R. To begin with, the Court must determine if Group R is a successor in interest such that it is potentially liable under CERCLA. If yes, then the Court must determine if Marmon is a successor in interest to Group R and whether under Delaware law the United States can seek recovery directly from Marmon.

**A.  Is Group R a Successor in Interest subject to CERCLA liability?**

Marmon argues that Marmon cannot be liable as a shareholder of Group R for any CERCLA liability as Harry Magnuson already settled with the United States for clean up costs associated with the Golconda Property.  The Court rejects the argument that any settlement by Mr. Magnuson resolves all CERCLA claims against any other prior owners or operators of the Golconda Property.

It is stipulated to by the parties that Golconda Lead Mines, Inc. was an owner and operator within the meaning of CERCLA. Golconda Lead Mines, Inc. became Golconda Mining Corporation in 1962 after the milling operations at the Golconda Property had concluded.  Golconda Mining Corporation then became Golconda Corporation. Golconda Corporation merged with Astro Controls, Inc. into Golconda Mining Corporation.  In 1970, Golconda Mining Corporation changed its name to Golconda Corporation.  Later in 1970, Golconda Mining Corporation ("Golconda Mining Corporation 1970") was created as a subsidiary of the Golconda Corporation.

Golconda Corporation as the parent company of Golconda Mining Corporation 1970, sold all of its stock and its mining assets in Golconda Mining Corporation 1970, including the Golconda Property, to Harry Magnuson in 1976.

In 1977, Golconda Corporation merged with RegO Company.  RegO was the surviving company and under Delaware law RegO was vested with all assets and liabilities of Golcondo Corporation. RegO later changed its name to Group R.

Based on the undisputed corporate history, Group R was a successor in interest to the owners and operators of the Golconda Property. The Court finds as a matter of law that the Golconda Corporation was a successor in interest to Golconda Lead Mines, Inc. and even though Golconda Corporation later sold the Golconda Property, there was a period of time in which the Golconda Corporation was an owner or operator of the Golconda Property. The selling of the Golconda Property in 1976 does not eliminate CERCLA liability for a past owners or operators of the Golconda Property.  It merely results in another owner or operator being added to the list of potential responsible parties

under CERCLA. *See Louisiana-Pacific Corp. v. ASARC, Inc.,*909 F.2d 1260, 1262 (9th Cir. 1990) (Congress intended successor liability under CERCLA). CERCLA reaches preenactment releases of hazardous substances. *United States v. General Battery*, 423 F.3d 294, 308-09 (3rd Cir. 2005).

The fact that Harry Magnuson settled with the United States regarding the Golconda Property in an "ability to pay" settlement does not prevent the United States from seeking damages from other past owners or operators in the corporate history of the Golconda Lead Mines, Inc.  "CERCLA imposes 'strict liability for environmental contamination upon four classes of potentially responsible parties." *California Dept. of Toxic Substances Control v. Hearthside Residential Corp.,* 613 F.3d 910, 912 (9th Cir. 2010); *United States v. Bestfoods*, 524 U.S. 51 (1998).

Mergers, sales of assets and changing corporate names does not remove potential CERCLA liability.  *Alley v. Miramon*, 614 F.2d 1372, 1384 (5th Cir. 1980); *Bankers Life & Cas. Co. v. Kirtley*, 338 F.2d 1006, 1013 (8th Cir. 1964).  CERCLA allows for past owners who never operated the site at a time when hazardous substances were released to be liable merely because they owned the site at issue at some point after the releases. Therefore, Group R is a successor in interest to the Golconda Corporation which at one time owned the Golconda Property and Group R can be liable for the response costs incurred in connection with the Operable Unit 3 of the Bunker Hill Site under § 107(a)(2) of CERCLA regardless of the fact that Harry Magnuson already settled with the United States for clean up costs associated with the Golconda Property.

**B.  Is Marmon a Successor in Interest to Group R?**

The Court previously determined that the Plan of Liquidation was ambiguous and that the Court would consider extrinsic evidence to determine if Marmon was a "successor in interest" and had assumed the liabilities of Group R. The United States argues, regardless of Mr. Webb's and Ms. Mandel's testimony, the only way to construe the Plan of Liquidation to comport with Delaware law is to interpret the document as an implied assumption of the liabilities of Group R by Marmon. Marmon contends the Court must find the Plan of Liquidation was a corporate dissolution of Group R, not a merger of Group R into Marmon.

The Ninth Circuit has not resolved whether state law or federal common law governs successor liability under CERCLA.  *See Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.,* 159 F.3d 358, 364 (9th Cir. 1998).  However, there have been some developments in the law since the *Atchison* case was decided and it seems most courts are leaning to applying state law to determine successor liability in CERCLA actions.  *See United States v. General Battery Corporation, Inc.*, 423 F.3d 294, 315 (3rd Cir. 2005) ("Despite bypassing the question we now consider, it is abundantly clear that the Ninth Circuit, were its hand forced, would follow the recent directives of the Supreme Court and hold that state law should govern successor liability under CERCLA."). As in *Atchison*, this Court need not decide whether federal or state law controls, because the Amended Complaint alleges that Marmon Holdings expressly assumed liability through the Plan of Liquidation.  Express assumption of liability is a standard basis for successor liability recognized both in federal common law and in Delaware law.  *See id.* at 361

(holding under federal common law, successor liability is created when "[t]he purchasing corporation expressly or impliedly agrees to assume the liability."); *Great American Ins. Co. of New York v. TA Operating Corp.*, No. 06 Civ. 13230, 2008 WL 1848946, at *3 (S.D.N.Y. April 24, 2008) (recognizing that under Delaware law liability attaches when "the successor expressly or impliedly assumed such liability.").

The disagreement between the parties turns on interpretation of the Plan of Liquidation signed by Group R and Marmon Holdings.  The Plan of Liquidation includes a section titled "Plan of Distribution to Creditors," which restates in entirety the language of § 281(b) of Delaware's General Corporation Law.  This statutory language is followed by one sentence of unique language, which provides that claims against Group R "may be made by obtaining an undertaking from the sole stockholder [Marmon Holdings] to return such part, or all, of any distribution(s) . . . as is necessary in order to pay or provide compensation for such claims and obligations."  The Government contends that this amounts to a direct assumption of liability by Marmon Holdings.  Defendants counter that this language, particularly when read in the context of state law requirements concerning shareholder liability, only commits Marmon Holdings to return disbursements in the event of a judgment against Group R itself.

Because the Plan was drafted by the parties under Delaware law, the Court applies principles of contract interpretation from that state. "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1222 (Del. 1997).  A contract is ambiguous if it is "reasonably or fairly susceptible of different interpretations or may

have two or more different meanings." *Phillips Home Builders, Inc. v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del. 1997) (quotations omitted).  When there is ambiguity, the reviewing court may consider extrinsic evidence of the parties' intent.  *Eagle Indus., Inc.*, 702 A.2d at 1232.[1]

Whether the language of a contract is ambiguous is a question of law.  *In re U.S. Financial Securities Litigation*, 729 F.2d 628, 632 (9th Cir. 1984).  The parties' intent, determined through extrinsic evidence, is a question of fact.  *Id.* The Court previously determined that the Plan of Liquidation was ambiguous and that the Court would consider extrinsic evidence to determine if Marmon was a "successor in interest" and had assumed the liabilities of Group R.

After considering the testimony and exhibits, the Court finds the Plan of Liquidation was not intended to be a merger of the two corporations wherein Marmon assumed the liabilities of Group R as well as accepting the assets of Group R.  "[A]sset purchasers do not ordinarily incur successor liability."  *See Atchison, Topeka & Santa Fe R.R. Co. v. Brown & Byrant, Inc.,* 159 F.ed 358, 361 (9th Cir. 1998).  This same general rule would apply to asset distributions to shareholders, liquidating distributions to shareholders do not normally result in successor in interest liability.

---

[1] These principles of contract interpretation are the same as those that would be applied under federal law.  *See Pierce Cnty. Hotel Emp. & Restaurant Emp. Health Trust v. Elks Lodge*, 827 F.2d 1324, 1327 (9th Cir. 1987) ("Extrinsic evidence is inadmissible to contradict a clear contract term, but if a term is ambiguous, its interpretation depends on the parties' intent at the time of the contract's execution, in light of earlier negotiations, later conduct, related agreements, and industrywide custom[.]") (internal citations omitted).

The Plan of Liquidation was a plan to dissolve Group R and Group R's General Counsel, Mr. Webb (who also served as Marmon's General Counsel) did not recall that any liabilities that existed at the time Group R was dissolved.  While the Government finds this testimony unrealistic due to potential CERCLA claims Mr. Webb should have been aware of, Mr. Webb's testimony is an accurate statement when considering Group R's financial statements which gave a book value to the residual interest RegO Claimants Trust of $0 and there is no evidence of any other liabilities as all RegO's assets were used to fund the trust. Moreover, outside counsel, Ms. Mandel, testified she prepared the Plan of Liquidation to dissolve Group R, not as a document to merge it into Marmon and there is no evidence before the Court of any other intent on the part of Group R or Marmon.

The Court finds Group R and Marmon were sophisticated entities with experienced officers, general counsel and outside counsel.  Based on the history of Group R and its predecessor companies, it was clear the officers of Group R knew how to merge corporations as they had done so in the past, but that was not what was done on July 31, 2003.  Group R was a holding company (after RegO Claimants Trust was court approved) and was inactive until its dissolution in 2003. The Plan of Liquidation does not expressly state that Marmon was assuming any liabilities (even though the Plan of Liquidation was required under Delaware law to account for future liabilities and claims). As Ms. Mandel testified, Marmon did not intend or expressly obligate itself to litigate claims against Group R in the Plan of Liquidation and such is not required under Delaware law for a Plan of Liquidation.

Further, the Court concludes the unique language in the Plan of Distributions to Creditors section of the Plan of Liquidation does not create an "implied assumption" of all liabilities. The language that claims against Group R may seek to have [Marmon Holdings] "return such part, or all, of any distribution(s) . . . as is necessary in order to pay or provide compensation for such claims and obligations" only means that if there is a valid claim or judgment against Group R, Group R can seek to recover assets distributed to shareholders it does not imply Marmon has assumed all potential liabilities and the duty to litigate all claims against Group R.

For these reasons, the Court finds the Plan of Liquidation, was just that, a plan to dissolve Group R and distribute its remaining asset to its sole shareholder, Marmon. Marmon was not an express or implied "successor in interest" to Group R, but was a shareholder who received a distribution from a dissolved corporation.

## C.  If not a Successor in Interest, can Marmon be held liable for CERCLA liability against Group R?

The answer to this question is complex. Clearly, CERCLA recognizes broad corporate liability for releases of hazardous substances. However, this Court must look to Delaware law to determine if the United States can sue a shareholder (who is not a successor in interest) and if so, what steps it must take to do so.  The parties have made arguments in their briefs regarding how Delaware law should be interpreted. Fortunately, the Delaware Supreme Court issued an opinion after the trial in this matter which

interprets and answers many questions presented in this case:  *In the Matter of Kraft-Murphy Company, Inc.*, 82 A.3d 696 (Del. 2013).

It is interesting that the other Delaware court case applicable in this case is Court of Chancery of Delaware opinion *In re RegO Company*, 623 A.2d 92 (Del Ch. 1992). It is the *RegO* case wherein the dissolving corporation filed a petition for approval of a plan of security for corporate claimants related to faulty valves that RegO produced.  This is the same RegO that Golconda Corporation merged with in 1977 and that eventually changed its name to Group R Co., Inc. in December of 1992 and dissolved in July 31, 2003. It is the

In *RegO*, the Court held that under Delaware General Corporation Law that a dissolved Delaware corporation may achieve, after a judicial proceeding, court approval of a plan of security for corporate claimants that precludes liability on the part of the directors and shareholders and establishes a limitations period for such actions against shareholders on claims against the corporation. The Court determined RegO's assets were most probably inadequate to compensate all of the present and future claimants and that the present and future claims had a present discounted value of over $57 million. *Id.* at 1096. Since the plan to fund claimants was funded by all of the dissolving corporation's assets and is fair to all classes of present and future claimants, the Court approved the RegO Claimants Trust even though the Court anticipated that the RegO Claimants Trust may have to exist for more than 10 years. It is RegO's (or Group R's) reversionary interest in the RegO Claimants Trust that was transferred to Marmon as the sole shareholder of Group R when it dissolved. At the time it was assigned to Marmon in

2003, it had been in existence for 20 years and it was likely that reversionary interest may have significant value based on the value of the trust corpus in 2002.

The Court has determined based on the expert testimony at trial that the reversionary interest in the RegO Claimants Trust had a value of  $44 million when it was sold by Marmon in 2008.  The fact that Group R and Marmon recorded the value of the reversionary interest at $0 on their financial records is without relevance as the accounting experts testified that accounting for financial statements is a completely different purpose than determining a value of a reversionary interest. After the RegO Claimants Trust had paid claims for 20 years, it has a trust corpus of $43,046,190 in December of 2002. The officers of Group R and Marmon both knew or should have known there was significant value to the reversionary interest asset Group R held – why else would Group R have distributed an asset worth $0?

Now that the existence of the court approved RegO Claimants Trust has been discussed, the Court can address the statutory issues surrounding dissolved corporations. It is undisputed there are monies that arguably could be recovered from Marmon under the terms of the Plan of Liquidation, if the CERCLA damages are proven and Delaware corporate law allows. While this Court has found for purposes of this case, that the United States has proven by a preponderance of the evidence that CERCLA liability appears to exists for Group R, it makes no findings regarding the damages associated with the liability for releases of hazardous substances discussed earlier in the factual findings.

Having found that Marmon is not a successor in interest to Group R, it is undisputed that under Delaware law "[n]o suit shall be brought against any officer, director or stockholder for any debt of a corporation of which such person is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution thereon return unsatisfied." 8 Del. C. § 325(b). Here, there is no pre-existing CERCLA judgment against Group R as Group R is a dissolved corporation and has not been sued by the United States. Marmon claims since it is not a successor in interest to Group R, the United States cannot circumvent § 325(b) and sue Marmon directly for Group R's CERCLA's liability. The Court agrees, however, this does not end the inquiry.

The *Kraft-Murphy* decision clarifies what was most likely a misinterpretation on the part of the United States, that it could not seek to sue a dissolved corporation after more than three years and a better course of action was to argue its "successor in interest" theory and that the claim against Marmon was brought within ten years of Group R's dissolution. This argument is not consistent with current Delaware law. *Kraft-Murphy* makes clear that there is no time limit on when a party can request a receiver be appointed to represent a dissolved corporation and there is no ten (10) year statute of limitations on bringing a suit against a dissolved corporation. There may be other statutes of limitations on certain types of claims, but the corporate statutes do not time bar all claims against a dissolved corporation after ten years. So the United States cannot claim its filing of a lawsuit against Marmon within ten years of Group R's dissolution justifies circumventing § 325(b).

There are two ways to dissolve a corporation in Delaware. The first is under § § 280-281(a) to seek a court supervised process in which notice is given, security is set aside for pending and contingent claims, and provides for the distribution of remaining assets to shareholders. This method was not used by Group R. Instead, Group R chose the second way under § 281(b) which provides a "safe harbor" dissolution for corporations following an unsupervised default procedure which requires the corporation to adopt a plan of distribution within three (3) years of dissolution that "reasonably provides" for: "(i) all claims known to the corporation, (ii) any suits pending against the corporation, and (iii) claims that are likely to arise or become known to the corporation or successor entity within 10 years after the date of dissolution."   8 Del. C. § 281(b).  "Compliance with either § § 280-281(a) or § 281(b) shields directors and shareholders of the dissolved corporation from post-dissolution liability to third party claimants." *Kraft-Murphy* at 705. The court went on to explain that the safe harbor provisions do time bar certain claims against a dissolved corporation, but not all claims. *Id.*  It is undisputed that Group R did not give notice to the United States of its dissolution nor did it reject a claim made by the United States, so §§  280(a)(2) and (a)(4) do not apply to prevent an action against Group R.

*Kraft-Murphy* holds that the ten year claim periods in § § 280 and 281(b) do not extinguish a dissolved *corporation's* liability even though the liability of directors and shareholders may be limited if the safe harbor terms have been complied with. *Id.* 706-07.  In order to sue a dissolved corporation after the three year winding up period, a receiver must be appointed for the dissolved corporation to participate in litigation. *Id.* at

MEMORANDUM DECISION AND ORDER - 28

709. That is because after the three year winding up period under § 278, the "body corporate" ceases to exist. *Id.*   "As a pure matter of statutory law, the Corporation lacks any authority to continue managing the winding-up of its business, which includes defending lawsuits brought against it. Only if a receiver is appointed can the Corporation lawfully obtain that authority."  *Id.*

Section 279 supports that a motion to appoint a receiver for a dissolved corporation can be made "at any time." "When any corporation organized under the is chapter shall be dissolved in any manner whatever, the Court of Chancery, on application of any creditor, stockholder or director of the corporation, or any other person who shows good cause therefor, at any time, may either appoint 1 or more of the directors of the corporation to be trustees, or appoint 1 or more persons to be receivers, of and for the corporation, . . . to prosecute and defend, in the name of the corporation, or otherwise, all such suites as may be necessary or proper for the purposes aforesaid, . . . that may be necessary for final settlement of the unfinished business of the corporation." 8 Del. C. § 279.

Here, to the Court's knowledge, the United States has not attempted to have a receiver appointed to defend against a CERCLA action and/or to recover assets distributed to Marmon to cover the amount of any CERCLA damages awarded. To the extent the United States argues the Plan of Liquidation is defective in that it failed to address and provide for potential CERCLA liabilities, the Court will leave that argument to be addressed by a Delaware Court as Group R is not a party to the action at bar. Any alleged defect in the Plan of Liquidation may be a factor in determining whether

a receiver should be appointed, but it is not an issue for this Court to resolve since there is no outstanding judgment against Group R at this time to allow the United States to seek recovery from Marmon directly.  It is also for a Delaware court to determine if the Plan of Liquidation by Group R was defective in not providing for known or likely potential CERCLA claims, does Marmon still retain the shield from liability for shareholders under the non-court supervised dissolution procedures of § 281(b).

The fact that there is no judgment against Group R, prevents the United States from proceeding with this action against Marmon at this time.

## Order

**IT IS ORDERED:**

Plaintiff is without legal authority at this time to seek recovery under CERCLA from Marmon Holdings, Inc. as Marmon Holdings Inc. is not a successor in interest to Group R. Plaintiff's CERCLA claim against Marmon Holdings, Inc. is **DISMISSED** as a matter of law and the case is terminated.

DATED: September 30, 2015

Edward J. Lodge
United States District Judge

MEMORANDUM DECISION AND ORDER - 30